# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| IN RE: | ) | **Chapter 7** |
| | ) | |
| **DEMETRIOS ARVANITIS,** | ) | **Case No. 14-15420** |
| | ) | |
| Debtor. | ) | **Honorable Judge Schmetterer** |
| _____ | )____ | _____ |
| **FNA GROUP, INC.,** | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Adversary No. 14−00514** |
| | ) | |
| **DEMETRIOS ARVANITIS,** | ) | |
| **Defendant.** | ) | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Following trial both parties rested and argued by written submissions.

The following Findings of Fact and Conclusions of Law are now made and entered.

Defendant filed only a Trial Memorandum by way of his argument and did not file proposed findings of fact as ordered. Defendant thereby failed to challenge findings proposed by Plaintiff except as he may have impliedly done so in his Trial Memorandum.

## INTRODUCTION

Debtor/Defendant held a responsible leadership position within the Plaintiff business, but resigned after an incident that angered him. He had received much proprietary data and information of the company while employed, but did not return it after resigning. His counsel promised to allow the Plaintiff's experts to see what was included in the retained data only if Plaintiff offered him a severance package. Related threats were submitted to the Plaintiff. The Plaintiff hired experts to find out what data was retained by Debtor and incurred great expense in that endeavor.

Ultimately, Debtor destroyed the technology containing the data he had continued to hold following his resignation, without first showing it to Plaintiff.

## FINDINGS OF FACT

1.      The Plaintiff FNA is an Illinois Corporation that manufactures and sells pressure washers.  (FNA's Uncontested Facts [Dkt. No. 25] ¶ 1; Defendant's Response to Uncontested Facts [Dkt No. 31] ¶ 1)

2.      FNA sells power washers, both gas and electric, under the Delco, Simpson and Power Washer brands, and it also licenses the DeWalt and Black & Decker pressure washer brands.  (11/4/13 Contempt Hearing Testimony of Gus Alexander, Exhibit 39 at p. 8, ln. 15-20)

3.      In 2012, FNA had facilities in Elk Grove Village, Illinois and in Arkansas.  (Ex. 39 at p. 8, ln. 2-6)  FNA also had affiliations with facilities in Shanghai and Ningbo, China. (Ex. 39 at p. 8, ln. 7-12)

4.      FNA customers include Home Depot, Costco, Sam's Club, Walmart, Tractor Supply, Blaine's Mills and Farm and Fleet.  FNA also makes a variety of hoses, pumps, engines generators and similar products. (Ex. 39 at pp. 8–9, ln. 1-16)

### Defendant's Responsibilities at FNA

5.      Defendant was an employee of FNA for 16 years – from September 9, 1996 to on or about August 29, 2012 (the "**Employment Period**") – and, as such, all applicable federal or state laws establishing duties of employees to their employers applied to Arvanitis during this period.  (Stipulation of Uncontested Facts submitted by the Parties on March 19, 2015 ¶ 1, hereafter "**Stipulation**")  He resigned, due to an incident that he felt demeaned him.

6.      On the date of his departure from FNA, Defendant was Director of Operations and Logistics whose job responsibilities included supervising FNA facilities and operations and

security for FNA's buildings. (Stipulation ¶ 2);   (Exhibit 39 at p. 11, ln. 1-5; Trial Transcript at

p. 130, ln. 5-11; p. 330, ln. 11-22)

7.      As Director of Logistics, Defendant worked directly with steamship lines and

domestic carriers to arrange for shipment of goods into and out of the United States and to

arrange for transportation of goods to and from any FNA facility. (Trial Transcript at 331;

Exhibit 39 at 11-12)

8.      As Director of Operations and Logistics, Defendant had access to FNA's

information regarding its shipping, logistics and world-wide freight forwarders.  (Trial Transcript

at p. 201, ln. 12-25)  Defendant knew that such shipping and pricing information was

confidential. (Transcript at p. 202, ln. 3-12)

9.      During the Employment Period, Defendant also was responsible for managing the

people and the area  in which pumps and other equipment were refurbished. (Trial Transcript at

p. 331, ln. 18-25).  FNA refurbished some of the machines that were returned from customers

and, once refurbished, those machines were resold. (Exhibit 39 at p. 12, ln. 1-11; p. 45, ln. 8-24)

10.      During the Employment Period, Defendant also was in charge of all security for

FNA, and for each of FNA's facilities.  (Trial Transcript at p. 200, ln. 1-8; p. 331, ln. 3-7)

Because of Defendant's responsibilities as head of security and his other duties at FNA,

Defendant had access to and was entrusted with all confidential FNA information.  (Trial

Transcript at p. 332, ln. 1-10; Exhibit 39 at p. 10, ln. 18-20; p. 12, ln. 12-17)

11.      FNA's security systems were entrusted to Defendant, and the FNA security

system was connected to Defendant's computer. (Trial Transcript at p. 200, ln. 1-8; Exhibit 39 at

p. 130, ln. 2-17)

## The Trade Secret Agreement

12.    On September 9, 1996, Defendant executed a Trade Secret/Non-Disclosure

Agreement as a condition of his employment by FAIP North America, Inc., (the "**Trade Secret**

**Agreement**"), which subsequently changed its name to FNA Group, Inc.  (Exhibit 20)

13.    On page 1 of the Trade Secret Agreement, the term "trade secrets" was defined as

follows:

> Trade secrets shall mean all documentation, software, know-how
> and information relating to the past, present, or future business of
> FAIP North America, Inc., or any plans therefore, or relating to the
> past, present or future business of a third party or plans therefore
> that are disclosed to FAIP North America, Inc., where FAIP North
> America, Ind. Does not disclosure the third parties without
> restrictions on use or further disclosure.

(Exhibit 20 at 1)

14.    On page 2, the Trade Secret Agreement, in relevant part, provided:

> During the term of his or her relationship with FAIP North America, Inc.
> and thereafter, Demetrios J. Arvanitis shall treat trade secrets in a
> confidential basis and shall not disclose them to others without the prior
> written permission of FAIP North America, Inc., or use trade secrets for
> any purpose, other than for the performance and services of FAIP North
> America, Inc.
>
> Demetrios J. Arvanitis acknowledges the trade secrets are the sole and
> exclusive property of FAIP North America, Inc. He or she shall surrender
> possession of all such trade secrets to FAIP North America, Inc. upon any
> suspension or termination of his or her relationship with FAIP North
> America, Inc.  If after said suspension or termination, he or she becomes
> aware of any trade secrets in his or her possession, Demetrios J. Arvanitis
> shall immediately surrender the possession thereof to FAIP North
> America, Inc.

(Exhibit 20 at 2)

15.    The Trade Secret Agreement, in relevant part, further provided:

> All FAIP North America, Inc. confidential information will remain the exclusive property of FAIP North America, Inc. and will not be disclosed to others by Demetrios J. Arvanitis at any time.

> The confidential information will not be disclosed by Demetrios J. Arvanitis to any current or prospective competitor of FAIP North America, Inc. except if such confidential information is at the time of its disclosure by either party public information because of events other than by each wrongful act of disclosing.

> Demetrios J. Arvanitis agrees to return all physical "evidence of confidential information" to FAIP North America, Inc. upon the conclusion or termination for any reason.

(Exhibit 20 at 2-3)

16.    Based on Defendant's execution of the document, Defendant was at all times bound by the terms of the Trade Secret Agreement. (Defendant's Response to Uncontested Facts [Dkt. No. 31] ¶ 11)

17.    Defendant does not dispute that he was bound by the Trade Secret Agreement, and he admits that the signature on the Trade Secret Agreement looks like his signature. (Trial Transcript at p. 306, ln. 18-25; Exhibit 20)

18.    Defendant is aware that, during his employment, a confidentiality policy existed at FNA and that, once he left FNA's employment, he was obligated by his Trade Secret Agreement to return all FNA property in his possession to FNA. (Trial Transcript at p. 307, ln. 1-13)

## FNA's VPN System
## And Use of Defendant's Password

19.    During the Employment Period, FNA maintained a Virtual Private Network system ("**VPN System**") which enabled Defendant to remotely access his FNA-supplied desktop

computer ("**Desktop**") from outside the office. (Trial Transcript at p. 142, ln. 7-12; 12/9/13

Contempt Hearing Testimony of Nicholas Barone, Exhibit 40 at p. 61, ln. 12-20)

20.    To access the VPN System, a Defendant brought his personal laptop ("**Laptop**")

to FNA's Information Technology Manager ("**IT Manager**") who installed FNA's VPN System

software on the Laptop.  (Trial Transcript at p. 142, ln. 15-25; p. 143, ln. 5-20; Exhibit 43 at p.

104, ln. 1-4)

21.    After the VPN System software was installed on his Laptop, Defendant created a

user name and password in order to "authenticate" his Laptop with the FNA VPN System.

(Exhibit 43 at p. 104, ln. 14-20; Trial Transcript at p. 142-43).  Defendant's user name and

password which enabled Defendant to remotely access his Desktop were known only to

Defendant. (Exhibit 43 at p. 104)

22.    Once installed, the VPN System software enabled Defendant to log into the FNA

VPN System and his Desktop from any remote location, such as his home or a hotel, as if

Defendant were sitting in front of his Desktop.  (Trial Transcript at p. 142-43, ln. 15-4; Exhibit

40 at p. 63, ln 15-22).

23.    The VPN System allows a remote user, like Defendant, to transfer, copy, move,

delete files as if the user were sitting at his Desktop.  (Exhibit 43 at p. 105, ln. 1-21; p. 119, ln.

20-24; and p. 128, ln. 6-16)  Using the VPN System, Defendant could print any FNA file on his

Desktop to a remote printer. (Exhibit 43 at p. 105, ln. 1-21; p. 119, ln. 20-24; and p. 128, ln. 6-

16)

24.    Remotely accessing Defendant's Desktop files required knowledge of

Defendant's user name and password.  (Exhibit 43 at p. 135-36, ln. 21-8)  No one was able to

access a user's FNA computer unless the user gave the password to that person. (Exhibit 43 at pp. 135-136, ln. 21-8)

25.    It was not Defendant's custom or practice to give out his user name and password, and he did not remember giving his user name and password to FNA ownership. (Trial Transcript at p. 253-54, ln. 17-8)

26.    Defendant testified that he shared his user name and password only with the IT Manager and with Sonia Bell, the FNA office administrator, who logged onto Defendant's Desktop for payroll purposes. (Trial Transcript at p. 254, ln. 14-17). Defendant further testified that he "cannot imagine" that Ms. Bell used his password to transfer files other than those concerning payroll or employment. (Trial Transcript at p. 254, ln. 18-21)

27.    Defendant admitted that, at times, he asked the IT Manager to access Defendant's Desktop in order to fix some difficulty he had with that computer. (Trial Transcript at p. 254-55, ln. 22-15) However, Defendant does not know of any other instance in which the IT Manager logged onto Defendant's Desktop. (Trial Transcript at p. 255)

28.    FNA's IT Manager, Shawn Hamm, and FNA's expert, Nicholas Barone, testified that Defendant's password was known only to Defendant. (Exhibit 43 at p. 135-36, ln. 21-8; Exhibit 40 at p. 64, ln. 6-22)

29.    While Defendant was an FNA employee, he used his Laptop for business purposes. (Trial Transcript at p. 203, ln. 2-4; 4/3/14 Contempt Hearing Testimony of Demetrios Arvanitis, Exhibit 42 at p. 31, ln. 18-20) Defendant testified that, between 2009 and August 30, 2012, he used the VPN System more than 500 times in order to access his Desktop and the FNA computer system. (Trial Transcript at p. 203, ln. 5-7; Exhibit 43 at p. 103, ln. 1-5, 18-20)

30.    As an FNA employee, Defendant would remotely access his Desktop to transfer FNA documents to his personal email account for use wherever he was located.  (Trial Transcript at p. 203-204, ln. 13-2)

31.    Defendant also used a flash drive to transfer documents from his Desktop so that he could work on FNA documents from wherever he might be located. (Trial Transcript at p. 204, ln. 3-15)

32.    Defendant used a computer from home with the path name of Demetrios-PC to remotely access his FNA Desktop. (Exhibit 43 at p. 103, ln. 18-20)  Defendant also used another computer named Demetri-PC to remotely access his Desktop. ( Exhibit 43 at 104, ln. 5-21; p. 105, ln. 22-24; p. 107, ln. 20-23)

### Defendant's Transfer of Confidential FNA Information and Documents to Defendant's Personal Email

**A.    The April 15 Transfer**

33.    On April 15, 2012, while he was an FNA employee, Defendant transferred to his personal email account, designated as darvanitis@comcast.net, an email containing a list of FNA spare parts, specific part numbers and inventory quantities of those FNA parts (the "**April 15 Transfer**"). (Trial Transcript at p. 205, ln. 18-25; p. 206, ln. 1-4, 18-24; p. 207, ln. 1-15; Exhibit 5; Exhibit 39 at pp. 78-79)

34.    Such information is confidential and proprietary and, if FNA competitors learned this information, they could calculate FNA's manufacturing costs as well as its margins. (Exhibit 39 at p. 79, ln. 2-18)

35.    The information contained in the April 15 Transfer constituted "trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to return to FNA after his resignation on August 29, 2012.  (Exhibit 20).

36.     The information and documents contained in the April 15 Transfer were never returned to FNA.  (Trial Transcript at p. 304, ln. 7-14; Exhibit 39 at p. 79, ln. 19-21)

37.     Defendant testified that the information and documents contained in the April 15 Transfer remained in Defendant's personal email account until such documents were deleted sometime in early 2013.  (Trial Testimony at p. 208, ln. 16-20) Defendant testified that he had no concerns about holding that material after resigning, that he "didn't give it the time of day" referring to the fact that he retained the April 15 Transfer material until early 2013.  (Trial Testimony at p. 208, ln. 21-24)

**B.     The May 11 Transfer**

38.     On May 11, 2012, while he was an FNA employee, Defendant transferred to his personal email account, designated as darvanitis@comcast.net, an email containing information regarding FNA's shipping process and written procedures regarding that shipping process for FNA customers. (Trial Transcript at pp. 212-213, ln. 5-16; Exhibit 7; Exhibit 39 at pp. 81-82, ln. 20-8)

39.     The May 11 Transfer contains FNA business documents sent to Defendant from an employee at the FNA Arkansas facility.  (Trial Transcript at p. 212, ln. 16-25)

40.     The information contained in the May 11 Transfer was subject to confidentiality agreements between FNA and many of its major vendors such as Walmart, Sam's Club and Home Depot. (Exhibit 39 at pp. 82-83, ln. 20-5)

41.     The information and documents contained in the May 11 Transfer constituted "trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to return to FNA after his resignation on August 29, 2012.  (Exhibit 20).

42.     The information and documents contained in the May 11 Transfer were never returned to FNA.  (Trial Transcript at p. 304, ln. 7-16; Exhibit 39 at p. 82, ln. 17-19)

43.     Defendant testified that the information and documents contained in the May 11 Transfer remained in Defendant's personal email account until the time that Defendant destroyed his personal Laptop sometime in early 2013.  (Trial Testimony at p. 214, ln. 2-8)

**C.     The May 14 Transfer**

44.     On May 14, 2012, while he was an FNA employee, Defendant transferred to his personal email account, designated as darvanitis@comcast.net an email containing an appraisal report, prepared by a third-party equipment appraiser MEI Corporation, providing a value analysis of returned Husky electric pressure washers in inventory at FNA (the "**May 14 Transfer**").  (Trial Transcript at p. 210, ln. 3-10; Exhibit 6; Exhibit 39 at p. 80, ln. 2-12)

45.     Such information was confidential and proprietary consisting of a final valuation of returned FNA product relating to a dispute with FNA's Italian counterparts. (Exhibit 39 at pp. 80-81, ln. 24-13)

46.     The information and documents contained in the May 14 Transfer constituted "trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to return to FNA after his resignation on August 29, 2012.  (Exhibit 20).

47.     The information and documents contained in the May 14 Transfer were never returned to FNA.  (Trial Testimony at p. 210, ln. 13-22; p. 304, ln. 7-16; Exhibit 39 at p. 80, ln. 21-23)

48.     Defendant testified that he does not remember deleting the information and documents contained in the May 14 Transfer.  (Trial Testimony at p. 210, ln. 13-16)

**D.** **The June 15 Transfer**

49.     On June 15, 2012, while he was an FNA employee, Defendant transferred to his
personal email account, designated as darvanitis@comcast.net, an email containing shipping and
pricing information and documents regarding FNA's forwarders for China, all of FNA's contacts
throughout the FNA system, and procedures depicting how FNA does business with respect to its
freight orders (the "**June 15 Transfer**"). (Trial Transcript at pp. 213-14, ln. 14-4; Exhibit 8;
Exhibit 39 at p. 83, ln. 11-22)

50.     The information and documents transferred by Defendant to his personal email
account on June 15, 2012 were confidential. (Trial Transcript at p. 214, ln. 1-4; Exhibit 39 at p.
84, ln. 7-11)

51.     The information and documents contained in the June 15 Transfer constituted
"trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to
return to FNA after his resignation on August 29, 2012. (Exhibit 20).

52.     The information and documents contained in the June 15 Transfer were never
returned to FNA. (Trial Transcript at p. 304, ln. 13-16; Exhibit 39 at p. 84, ln. 12-14)

53.     Defendant testified that he does not remember deleting the information and
documents contained in the June 15 Transfer but that those materials were deleted no later than
the date Defendant's Laptop was destroyed in early 2013. (Trial Transcript at p. 214, ln. 18-24)

**E.** **The June 22 Transfer**

54.     On June 22, 2012, while he was an FNA employee, Defendant transferred to his
personal email account, designated as darvanitis@comcast.net, an email containing documents
and information regarding FNA's pricing system under consideration and the actual final pricing

from logistics companies shipping FNA products (the "**June 22 Transfer**"). (Trial Transcript at p. 216, ln. 7-17; Exhibit 9; Exhibit 39 at pp. 84-85, ln. 18-4)

55.    The information and documents transferred by Defendant to his personal email account on June 22, 2012 is confidential.  (Trial Transcript at p. 216, ln. 18-20; Exhibit 39 at p. 85, ln. 13-18)

56.    The information and documents contained in the June 22 Transfer constitute "trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to return to FNA after his resignation on August 29, 2012.  (Exhibit 20).

57.    The information and documents contained in the June 22 Transfer were never returned to FNA.  (Trial Transcript at p. 304, ln. 13-16; Exhibit 39 at p. 85, ln. 18-22)

58.    Defendant testified that he does not remember deleting the information and documents contained in the June 22 Transfer, but they were deleted no later than the date when Defendant's Laptop was destroyed in early 2013.  (Trial Transcript at pp. 216-17, ln. 21-4)

F.    **The August 5, 2012 Transfer**

59.    On August 5, 2012, while he was an FNA employee, Defendant transferred to his personal email account, designated as <u>darvanitis@comcast.net</u>, an email containing spreadsheets depicting FNA's import costs, pricing and the logistics companies with which FNA does business (the "**August 5 Transfer**").  (Trial Transcript at p. 215, ln. 1-16; Exhibit 4; Exhibit 39 at p. 76, ln. 8-17)

60.    The information and documents transferred by Defendant to his personal email account on August 5, 2012 were confidential data of the Plaintiff.  (Trial Transcript at p. 215, ln 17-19; Exhibit 39 at p. 77, ln. 5-21)

61.    The information and documents contained in the August 5 Transfer constitute "trade secrets," as defined in the Trade Secret Agreement, which Defendant was required to return to FNA after his resignation on August 29, 2012. (Exhibit 20).

62.    The information and documents contained in the August 5 Transfer were never returned to FNA. (Trial Transcript at p. 304, ln. 13-16; Exhibit 39 at p. 77, ln. 22-24)

63.    Defendant testified that he does not remember deleting the information and documents contained in the August 5 Transfer, but they were deleted no later than the date when Defendant's Laptop was destroyed in early 2013. (Trial Transcript at pp. 215-216, ln. 20-1)

**G.    The 1:51 a.m. Transfer on August 29, 2012**

64.    By using the FNA VPN System, Defendant could access his Desktop and Hard Drive remotely through the FNA network. (Exhibit 40 at p. 63, ln. 17-22)

65.    Mr. Nicholas Barone, an FNA computer forensics expert whose testimony is summarized below, found evidence that at 1:51 a.m. on August 29, 2012, Defendant's user I.D. was used to log onto the FNA VPN System. (Exhibit 40 at pp. 61-62, ln. 16-14)

66.    Exhibit 17 was prepared by Mr. Barone and consists of all the active and deleted files that Mr. Barone and Navigant were able to identify on the Defendant's Western Digital Hard Drive. (Trial Testimony at p. 58, ln. 6-25; Exhibit 40 at p. 21, ln. 1-8)

67.    Mr. Barone testified that Exhibit 17 shows, on lines 642 (page 14) through 5277 (page 11), that approximately 4,600 files in the Hard Drive were accessed at 1:51 a.m. on August 29, 2012, which means that those files could have been opened, moved or copied at that time and date. (Trial Testimony at pp. 60-63; Exhibit 40 at pp. 27-29; Exhibit 17)

68.    Mr. Barone's expert opinion was that Defendant copied the 4,600 files which Exhibit 17 identifies as having been accessed on August 29, 2012. (Exhibit 40 at p. 29, ln. 1-11).

69.    The 4,600 files copied on August 29, 2012 contained a variety of FNA proprietary and confidential information and documents, including FNA financial spreadsheets, photographs of FNA operations, invoicing documents and AutoCAD files which are engineering drawings of products that FNA manufactures or contracts out to sub-manufacturers under confidentiality agreements. (Exhibit 39 at pp. 69-72, p. 75, ln. 2-17;  Exhibit 17)

70.    The 4,600 files were copied by Defendant about seven hours before Defendant sent his resignation email to FNA's President, Gus Alexander.  (Exhibit 1; Exhibit 39 at p. 70, ln. 17-20)

71.    Disclosure to third parties of the confidential files accessed on August 29, 2012, would be devastating to FNA. (Exhibit 39 at p. 75, ln. 2-17)

72.    On February 13, 2014, after hearing evidence over several days, Judge Kennedy of the Circuit Court of Cook County entered an order of civil contempt against the Defendant which found, by a preponderance of the evidence, that Defendant still retained possession of FNA documents and  materials which he failed to turn over to FNA as ordered.  (Stipulation ¶ 10)

### Defendant's Resignation on August 29, 2012

73.    Defendant testified that, on August 28, 2012, he had an argument with Chris Alexander, an executive with FNA, concerning a number of issues, including Defendant's job performance, refurbishing and how Defendant was handing his duties as Director of Operations and Logistics.  (Trial Transcript at p. 315, ln. 4-22)

74.     On August 29, 2012, at 8:44 a.m., Defendant sent an email to Gus Alexander (the

"**Resignation Email**") asserting that FNA had created a hostile work environment, that FNA had

"marginalized" Defendant's ability to perform as an effective Director of Operations and

Logistics, and that Defendant would report the hostile work environment "to the proper

authorities." (Trial Transcript at p. 263, ln. 3-5; p. 264, ln. 9-14; Exhibit 1; Exhibit 39 at p. 10, ln.

8-15, p. 13, ln. 10-15)

75.     Defendant's employment with FNA ended on August 29, 2012. (Stipulation ¶ 3)

76.     After sending the Resignation Email, Defendant retained counsel, Mr. John A.

Dienner, III, to negotiate a severance package with FNA. (Trial Transcript at p. 265, ln. 16-22;

p. 316, ln. 19-23)

77.     Defendant testified that he filed a constructive discharge complaint against FNA

with the Illinois Department of Labor but that the Department did not follow up with him. (Trial

Transcript at pp. 265-66, ln. 23-10)

### FNA's  Demand That Defendant Return
### Confidential and Trade Secret Documents and Information

78.     On August 30, 2012, Gus Alexander, FNA's President, responded to and denied

the allegations contained in the Resignation Email, and Mr. Alexander attempted to contact

Defendant about such allegations. (Exhibit 1)

79.     On September 5, 2012, Gus Alexander sent an email to Defendant requesting that

Defendant return, immediately, all FNA property in his possession.  Specifically, in the

September 5, 2012 email, Mr. Alexander requested the return of all FNA equipment, files and

record, as follows:

> Please return all FNA property in your possession immediately.
> This will include not only any company-issued or company-paid-
> for equipment, but also all files and records of FNA – whether in
> hard copy or electronic form – and all company software and other
> electronic data.  Without limiting the generality of the foregoing,
> please bring your laptop computer, flash drives, and other storage
> devices, and any other electronic media that might contain FNA
> data or software to FNA so we can have a third party remove
> FNA's proprietary data and software and return the devices to you.
> This material is being requested pursuant to Paragraph 6 of the
> Confidentiality Agreement between you and FNA and otherwise.
>
> Please also provide a list of all security systems passwords, user
> names, logins and other information that we will need to operate
> the security systems.
>
> Also, please provide a list of your personal items that you would
> like to remove from your office.  We will have the items boxed and
> delivered to you.

(Exhibit 23)

80.    On September 19, 2012, Mr. Alexander sent an email to Defendant which, at line

6, again requested examination of Defendant's personal Laptop for FNA data and software:

> The agreement you do have [with FNA] and which you have
> breached is your Confidentiality Agreement, and I still want you to
> bring in your laptop for a computer forensics expert to check for
> company data and software.

(Exhibit 26)

81.    Defendant testified that he received the September 5, 2012 email and the

September 19, 2012 email and acknowledged that he had no right to keep FNA's confidential

and proprietary information. (Exhibit 42 at p. 30, ln. 2-16; Trial Transcript at p. 220, ln. 8-23; p.

222, ln. 5-9)

82.     Defendant also testified that he knew FNA believed that Defendant's personal Laptop contained FNA documents and information. (Trial Transcript at p. 311, ln. 8-13) Yet, Defendant refused to submit his Laptop to FNA for inspection by its technical experts. (Trial Transcript at p. 311, ln. 8-22)

83.     However, from September 2012 through January 2013, Defendant's counsel, Mr. Dienner, continued to offer to allow Defendant's personal computer to be examined by an "independent 3rd party forensic specialist" if and when FNA and Defendant agreed to a severance settlement. (Exhibit 30)

84.     Defendant testified that he destroyed his personal Laptop in early 2013 rather than turn it over to FNA for inspection. (Trial Transcript at p. 214, ln. 5-8; p. 311, ln. 8-13; Exhibit 42 at p. 7, ln. 18-20)

**FNA's Concern over Defendant's Possession
of Trade Secret Documents and Information and
Retention of Navigant Consulting to Conduct Forensic Analysis**

85.     The business of manufacturing and selling pressure washers and power equipment is based on high volume and low margins. (Trial Transcript at p. 332, ln. 19-24; p. 333, ln. 1-6; Exhibit 39 at p. 9, ln. 4-18)

86.     Providing equipment to big-box retailers and original equipment manufacturers ("**OEMs**") requires close work with vendors and cost calculations that go out to four decimal places. (Trial Transcript at p. 332, ln. 19-24)

87.     Any information regarding technology, manufacturing process and cost is extremely confidential because it represents FNA's advantage over its competition. (Trial Transcript at pp. 332-33, ln. 19-6)

88.    As Director of Operations and Logistics, Defendant had access to most of FNA's information regarding its shipping, logistics and world-wide freight forwarders. (Trial Transcript at p. 201, ln. 16-21; p. 331, ln. 8-17)

89.    All pricing information, shipping analysis and spreadsheets regarding the import of spare parts are confidential. (Trial Transcript at p. 202, ln. 3-12; pp. 213-216)

90.    Defendant was responsible for Security at FNA, and in that role Defendant controlled a local video system in the Elk Grove Village facility and a web-based system for the Arkansas facility, both of which were useful for business purposes in case there was an accident, theft or a workers' compensation claim. (Trial Transcript at p. 200, ln. 1-8; p. 331, ln. 3-7)

91.    Defendant was a trusted confidante and employee and, because of his position and longevity at FNA, he had access to FNA confidential information. (Trial Transcript at p. 332, ln. 1-10; Exhibit 39 at p. 10, ln. 16-20)

**Testimony of Scott Solomon**

92.    Following Defendant's resignation, FNA retained Navigant Consulting to provide investigative and computer forensic services in connection with Defendant's resignation from FNA. (Trial Transcript at p. 46, ln. 15-23) Mr. Scott Solomon, who heads Navigant's computer forensic investigations practice in Chicago, lead the Navigant Consulting team. (Trial Transcript at p. 46, ln. 1-7)

93.    FNA directed Navigant to examine Defendant's files located on Defendant's FNA-supplied desktop, devices and email account. (Trial Transcript at p. 47, ln. 3-9; Exhibit 39 at p. 75-76, ln. 18-2) Specifically, Navigant examined Defendant's FNA-supplied desktop computer ("**Desktop**"); Western Digital hard Drive ("**Hard Drive**"); Blackberry device; and email files. (Trial Transcript at p. 49, ln. 1-7)

94.    The purpose of engaging Navigant to examine the Hard Drive, used by Defendant while he was an FNA employee, was to determine the type of information contained on the Hard Drive and to determine whether any information had been copied from the Hard Drive. (Trial Transcript at p. 57, ln. 10-19)

95.    Mr. Solomon, who leads the Navigant computer forensics team, described the standard-protocol methodology used by Navigant to conduct its forensic analysis of the FNA devices used by Defendant. (Trial Transcript at pp. 48-51) The methodology employed by Navigant is the ordinary and customary manner in which to conduct such forensic analysis of such computer devices. (Trial Transcript at p. 53, ln. 3-25)

96.    More than ten Navigant employees provided investigative and computer forensic services to FNA in connection with Defendant's resignation from FNA, created a number of exhibits used during the State Court Contempt Hearing and provided the services of Mr. Nicholas Barone who provided expert opinion testimony. (Trial Transcript at p. 48, ln. 3-25)

97.    Mr. Solomon testified that Navigant has invoiced more than $200,000 for its services to FNA in connection with Navigant's forensic and computer analysis of Defendant's Desktop, Hard Drive and devices and for Navigant's preparation of exhibits and the testimony provided for the State Court Hearings by Nicholas Barone. (Trial Transcript at 69-70)

98.    Mr. Solomon also testified that FNA has paid more than half of the amount invoiced by Navigant and Navigant expects that FNA will pay the full amount of its invoices relating to Defendant's actions. (Trial Transcript at p. 71, ln. 3-8)

### Testimony of Nicholas Barone

99.    On December 9, 2013, at the State Court trial on FNA's Motion for Contempt

("**State Court Contempt Hearing**"), FNA offered the expert testimony of Nicholas Barone, an

associate director for Navigant Consulting responsible for supervision of computer forensic staff

located in New York and Vienna, Virginia offices.  (Exhibit 40 at p. 7, ln. 1-17)

100.    Mr. Barone has been involved with more than 1,000 cases over a period of 27

years involving collection, preservation and analysis of electronically stored data ("**ESI**") and he

has qualified as an expert witness in approximately 15 cases in state and federal court and before

federal administrative agencies. (Exhibit 40 at pp. 8-9)

101.    Mr. Barone was allowed to testify as an expert witness in the State Court

Contempt Hearing  (Exhibit 40 at pp. 9-10, ln. 23-4)

102.    Mr. Barone and the Navigant team prepared Exhibit 16 which is referred to as the

USB Registry Report and which is commonly described as a list of all devices plugged into

Defendant's Desktop.   (Trial Transcript at p. 54, ln. 9-25; p. 55, ln. 1-6; Exhibit 40 at p. 15, ln.

1-8)

103.    A Western Digital Hard Drive (described as WD My Passport 0730 USB device)

was one of the devices listed on Exhibit 16 as having been connected to Defendant's Desktop at

FNA. (Trial Transcript at pp. 54-55, ln. 24-6)

104.    Exhibit 16 shows that the Hard Drive was plugged into Defendant's Desktop on

August 26 and, because the computer registry does not change the date a device is unplugged,

Mr. Barone's expert opinion was based on the assumption that the Hard Drive remained plugged

into the Defendant's Desktop through and including August 29, 2012. (Trial Transcript at pp. 55-

56, ln. 17-14; Exhibit 40 at pp. 89-90, ln. 13-7)

105.    Navigant examined all active and deleted files on the Hard Drive by creating an

exact digital image of the Hard Drive pursuant to forensically sound practices described in detail

by Mr. Barone. (Exhibit 40 at p. 21, ln. 1-8, 19-24; p. 22, ln. 1-24; p. 23, ln. 1-7)

106.    Exhibit 17 is a report generated by Mr. Barone and Navigant based on their

forensic examination of the Hard Drive and was admitted into evidence in the State Court

Contempt Hearing.  (Exhibit 40 at p. 23, ln. 3-9; p. 24, ln. 13-16)

107.    Exhibit 17 consists of all the active and deleted files that Mr. Barone and

Navigant were able to identify on the Western Digital Hard Drive.  (Trial Testimony at p. 58, ln.

4-25; Exhibit 40 at p. 21, ln. 1-3)

108.    Exhibit 17 shows, on lines 642 (page 14) through 5277 (page 11), that

approximately 4,600 files in the Hard Drive were accessed at 1:51 a.m. on August 29, 2012,

which means that those files could have been opened, moved or copied at that time and date.

(Trial Testimony at pp. 60-63; Exhibit 40 at pp. 27-29; Exhibit 17)

109.    The 4,600 files on the Hard Drive were accessed while Defendant was still an

employee of FNA and while Defendant still had use of the FNA VPN System to remotely access

FNA files.  (Exhibit 39 at pp. 69-70)  Defendant did not delete the VPN System software from

his personal Laptop until a day after he resigned on August 29, 2012.  (Trial Transcript at p. 150,

ln. 15-22)

110.    The 4,600 files accessed on August 29, 2012 contained a variety of FNA

proprietary and confidential information and documents, including FNA financial spreadsheets,

photographs of FNA operations, invoicing documents and AutoCAD files which are engineering

drawings of products that FNA manufactures or contracts out to sub-manufacturers under

confidentiality agreements. (Exhibit 39 at p. 70, ln. 21-24; p. 71, ln. 1-24; p. 72, ln. 1-2; p. 75, ln. 1-17; Exhibit 17)

111.    Any disclosure to third parties of the confidential files accessed by Defendant on August 29, 2012, would be economically harmful to FNA. (Exhibit 39 at p. 75, ln. 10-17)

112.    Mr. Barone's expert opinion was that Defendant copied the 4,600 files shown on Exhibit 17 as having been accessed on August 29, 2012. (Exhibit 40 at p. 29, ln. 1-11). Mr. Barone's conclusion was based on the fact that copying of files produces the kind of file signature pattern shown in the "accessed" column of Exhibit 17, that the Hard Drive was used by Defendant, and that the Hard Drive was attached to Defendant's Desktop. (Exhibit 40 at p. 29, ln. 14-24; p. 30, ln. 1-9)  The conclusion was not rebutted.

113.    On cross-examination by Defendant's counsel, Mr. Parisi, Mr. Barone testified that it was not possible that an automatic backup program accessed the 4,600 files on August 29, 2012. (Exhibit 40 at p. 52, ln. 13-24)

114.    Mr. Barone's testimony is based on the fact that he searched and did not find a program on the Hard Drive associated with backing up of files. (Exhibit 40 at p. 52, ln. 13-24)

115.    Mr. Barone further testified on cross-examination that his search of files on the Hard Drive included a search for deleted files, shown on 815 of Exhibit 17, which search produced no deleted files associated with backing up programs. (Exhibit 40 at p. 53, ln. 1-18)

116.    Mr. Barone further testified on cross-examination that he examined the active and deleted files of Defendant's Desktop and found no program associated with the backing up of files on the Desktop hard drive. (Exhibit 40 at p. 58, ln. 14-20)

117. Mr. Barone explained that Defendant did not need to be physically present at the FNA building at 1:30 on August 29, 2012 to access the 4,600 files because FNA provided remote access to his Desktop and Hard Drive. (Exhibit 40 at p. 61, ln. 16-20).

118. Additionally, Mr. Barone found evidence that, at 1:51 a.m. on August 29, 2012, Defendant's user I.D. was used to log onto the FNA VPN System. (Exhibit 40 at pp. 61-62, ln. 23-17) Logging onto the FNA VPN System is synonymous with logging on to Defendant's Desktop. (Exhibit 40 at p. 63, ln. 17-22)

119. Defendant offered no expert at the State Court Contempt Hearing or at the trial in this Court to contradict the testimony of Mr. Barone. (Trial Transcript at p. 278, ln. 5-12)

120. The information and documents transferred by Defendant to his personal computer on August 29, 2012 are proprietary and confidential but were never returned to FNA. (Exhibit 39 at p. 70, ln. 17-24; p. 71, ln. 1-24; p. 72, ln. 1-20; p. 73, ln. 18-20; p. 74, ln. 1-22; p. 75, ln. 1-17; Trial Transcript at p. 307, ln. 14-22)

121. Defendant made no effort to return to FNA any digital copies of information and documents that he may have transferred to himself when he was an FNA employee. (Trial Transcript at p. 307, ln. 14-22)

### The Testimony of Jerry Saperstein

122. On December 9, 2013, at the State Court Contempt Hearing, FNA offered the expert testimony of Jerry Saperstein, a computer forensics specialist. (Exhibit 41 at p. 96, ln. 7-16) Mr. Saperstein's Curriculum Vitae is admitted in the Bankruptcy Trial as Exhibit 19, and his testimony was made part of the trial evidence in this proceeding.

123. Much of Mr. Saperstein's work concerns examination and retrieval of data from computer storage devices, such as hard drives and CD-ROMs. (Exhibit 41 at p. 97, ln. 19-24)

23

124.    Mr. Saperstein was engaged by FNA to examine a CD-ROM which he received from FNA counsel and which was marked, "Samples time stamped of illegal wiretaps" (the "**CD-ROM**"). (Exhibit 41 at p. 101, ln. 1-24)

125.    The CD-ROM was contained in a sealed box that was delivered to FNA's Elk Grove Village facility in November or December 2012. (Exhibit 39 at pp. 18-19)  Also in the sealed box was an anonymous, threatening letter which was admitted in the Bankruptcy Trial as Exhibit 3. (The threats were to report improper refurbishing of certain equipment by the Plaintiff.)

126.    Mr. Saperstein created an exact digital duplicate of the CD-ROM containing every bit of the original, and he then examined the contents of the digital duplicate in a forensically sound manner. (Exhibit 41 at p. 104, ln. 1-4)

127.    Based on his examination, Mr. Saperstein concluded that the CD-ROM contained three audio files ("**Audio Files**") and a path showing the source of the Audio Files. (Exhibit 41 at p. 104, ln. 5-24)  A "path" is an automatic process governed by the operating system; the operating system, rather than an individual, creates the path. (Exhibit 41 at p. 119, ln. 11-17)

128.    The path on the CD-ROM showed that the Audio Files came from a computer named Demetrios-PC or that the Audio Files resided in a folder created for a user on a PC named Demetrios. (Exhibit 41 at p. 105, ln. 11-20; p. 118, ln. 11-23)  Mr. Saperstein found no other path or names on the CD-ROM. (Exhibit 41 at p. 105, ln. 11-20)

129.    Mr. Saperstein's expert opinion is that the Audio Files were associated with an authorized user by the name of "Demetrios." (Exhibit 41 at p. 105, ln. 21-24; p. 106, ln. 1-6)

130.    According to FNA's VPN log, Defendant remotely accessed FNA's VPN System 524 times using a remote computer with the name Demetrios-PC. (Exhibit 43 at p. 103, ln. 18-20)

131.    Mr. Saperstein also concluded that the Audio Files did not exist originally on the CD-ROM. Rather, they were transferred to the CD-ROM from an MP3 audio file from a computer designated as Demetrios-PC. (Exhibit 41 at p. 120, ln. 1-7)

132.    The Audio Files contained conversations at FNA offices that Defendant taped while he was an FNA employee. (Exhibit 39 at p. 42, ln. 11-24)

133.    Defendant was responsible for security at FNA and the camera system throughout the building merged into a digital video recorder in Defendant's office. (Trial Transcript at p. 200, ln. 1-8).

134.    Defendant testified that the video system served a business purpose and Defendant would review video tapes if there was an accident, or a workers compensation claim, or if there were theft. (Trial Testimony at p. 247, ln. 4-21)

### Defendant's Negotiations to Return FNA
### Documents and Threats to Disclose FNA Confidential Materials

135.    Defendant used his personal Laptop for business purposes and remotely accessed FNA's VPN System hundreds of times while he was an FNA employee. (Trial Transcript at p. 203, ln. 2-7 ; Exhibit 42 at p. 31, ln. 18-20; Exhibit 43 at p. 103, ln. 18-20)

136.    Defendant was aware that FNA demanded that he produce his personal Laptop to have it examined by FNA's forensic experts but he refused to do so. (Trial Transcript at p. 311, ln. 8-15; Exhibit 42 at p. 29, ln. 16-19; p. 31, ln. 3-20)

137.    Through his counsel, John A. Dienner, III, Defendant continued to negotiate for a severance package in return for which he would allow third-party examination of his personal

computer and other devices sought for inspection by FNA's computer experts.  (Exhibits 27 and

30)

138.    On January 25, 2013, Mr. Dienner sent an email to FNA counsel setting out deal

terms for a settlement with FNA which included the examination of his personal computer by

third-party forensic specialists.  (Exhibit 30)

139.    On March 11, 2013, Gus Alexander received an anonymous email (the

"**Threatening Email**") from "BeSmart@anonymousspeech.com" which contained the following

threat to release FNA confidential documents:

> Forget about the felonies that you have committed over the years.
> What is HOME DEPOT going to say when they are given
> evidence of defrauding over 8,000 of their customers just in July &
> August of 2012.  This includes signed affidavits, videos of the
> employees doing the refurbishing on USED AND ABUSED
> machines, copies of the shipping documents and invoices, e-mails
> from your GM, warehouse employees and your son?  Have you
> thought about those things?  How will that effect current, pending
> lawsuits?  I don't think you have really thought things through.
> The solution is right in front of you, but, your arrogance has
> clouded you and will cost you and all those around you dearly.
> You have until 3/13 to do what is right, after that it is out of your
> hands and mine.  Don't bother looking for a shoulder to cry on,
> you will be exposed for what you truly are.

(March 11, 2013 email, Exhibit 29)

140.    FNA counsel notified Defendant's counsel, John Dienner, about the Threatening

Email and, in response, Mr. Dienner admitted that the March 11, 2013 email was sent by

Defendant:

> I'm advised that the quoted email was in response to Gus' text to
> my client in which Gus threatened to disclose that my client had
> allegedly not properly taken care of his child support obligation.
> Apparently Gus thinks this gives him a reason not to come to terms

> with Demetrious.  So now we have threat vs. threat.  Your
> suggestion?

(March 12, 2013 email from John A Dienner, III to Mark Flessner, Exhibit 29)

141.    At the time the Threatening Email was sent, Defendant had authorized John

Dienner, his attorney, to communicate with FNA to attempt to arrange for a severance package.

(Trial Transcript at p. 256, ln. 4-25; p. 259, ln. 7-20; Exhibit 42 at pp. 36-37, ln. 15-6)

142.    The State Court Judge found that the statements of Mr. Dienner constituted an

admission by Defendant through his agent, and this Court so finds.  (Exhibit 42 at p. 58, ln. 1-12)

143.    Mr. Dienner continued to negotiate with FNA counsel regarding possible

settlement, including an offer of passcodes and an examination of Defendant's laptop as part of

settlement. (Exhibit 42 at pp. 36-37, ln. 15-6; Exhibit 27; Exhibit 30)

144.    On April 10, 2013, Dienner sent another email to FNA counsel setting out deal

terms for a settlement with FNA which also offered, "third party examination of my client's

computer . . ." (Exhibit 27)

145.    On April 23, 2013, Mr. Dienner sent an email to FNA counsel offering, "My

client will accept $90,000 (plus the other terms)," which included examination of Defendant's

computer.  (Exhibit 28)

146.    Negotiations between FNA and Defendant were not successful because, in FNA's

view, there was "no foundation" for Defendant's request for severance payment. (Exhibit 39 at p.

16, ln. 3-18)

147.    In mid-2013, FNA commenced a State Court Lawsuit against Defendant seeking

return of FNA's confidential information and documents. (Exhibit 39 at p. 16, ln. 13-15)

## The State Court Litigation

148.    On July 17, 2013, FNA filed a Third Amended Complaint against Defendant in the Circuit Court of Cook County, Chancery Division, Case No. 13 CH 13616 (the "**State Court Litigation**"). (Stipulation ¶ 4)

149.    On July 2, 2013, FNA filed a Motion for Temporary Restraining Order and a Preliminary Injunction ("**TRO Motion**") in the State Court Litigation seeking an order directing Defendant to return all of FNA's property and to prohibit Defendant from disclosing any Materials or Recordings to third parties. (Stipulation ¶ 5)

150.    On October 2, 2013, after a hearing and submission of briefs, Cook County Circuit Court Judge Kathleen G. Kennedy, granted FNA's TRO Motion finding, by a preponderance of the evidence, that FNA has a "clearly ascertainable right in need of protection on at least some of its claims, including breach of trade secret/non-disclosure agreement." (Stipulation ¶ 6)

151.    On October 23, 2013, FNA filed an Emergency Motion for Indirect Civil Contempt against Defendant for his willful failure to comply with the TRO Order (the "**Civil Contempt Motion**"). (Stipulation ¶ 9)

## The Civil Contempt Order

152.    On February 13, 2014, after hearing evidence over several days, Judge Kennedy entered an order of civil contempt against the Defendant (the "**Civil Contempt Order**"). (Stipulation ¶ 10)

153.    The Civil Contempt Order states, in relevant part:

> FNA established through the preponderance of the evidence that Mr. Arvanitis has possession of documents, materials, hardware or software as

set forth in the TRO which he has failed to turn over as ordered.
Therefore, Mr. Arvanitis is in indirect civil contempt of court.

(Stipulation ¶ 11)

154.   In the Civil Contempt Order, Judge Kennedy held that Defendant was in Civil

Contempt of the TRO Order entered on October 2, 2013 and imposed a fine in the amount of

$2,500 per day:

> Demetrios Arvanitis is fined $2,500 per day until he (a) returns any and all
> documents and materials of any nature pertaining to any work performed for or
> related to FNA, including any confidential or proprietary information which may
> have been obtained, such as audio/visual recordings and any copies thereof,
> documents, photographs, and any electronic data containing FNA business
> information, including any marketing plans, product plans, financial data,
> business strategies, personnel information and lists of customers or suppliers of
> FNA, and (b) turns over any computer hardware and software containing any of
> the information contained in (a) above, and any equipment, such as any recording
> devices, used to obtain any confidential or proprietary information of FNA.

(Stipulation ¶ 12)

155.   On June 19, 2014, following many evidentiary hearings conducted by Judge

Kennedy, the Second Contempt Order was issued that "reinstated" the Contempt Order:

> 1.   For the reasons set forth in open court, the finding of Indirect Civil
> Contempt against Demetrios Arvanitis is re-instated and Mr.
> Arvanitis is ordered to turnover all computers, laptop devices, and
> other electronic devices accessible to Mr. Arvanitis, including all
> electronic devices of immediate family members, capable of
> storing electronic information, for forensic analysis and review by
> the close of business (5 pm) on 6/19/14."

(Stipulation ¶ 13)

156.   Debtor failed to appeal or seek a stay of the Second Contempt Order. (Stipulation

¶ 14)

157.   Exhibits 1 through 43, inclusive, offered by FNA were admitted at trial without

objection by Defendant.  (Trial Transcript p. 27, ln. 13-20)

158.    Additional Facts set forth below in the Conclusions of Law will stand as additional Findings of Fact.

## CONCLUSIONS OF LAW

The discharge provided by the Bankruptcy Code is meant to effectuate the "fresh start" goal of bankruptcy relief. *Vill. of San Jose v. McWilliams*, 284 F.3d 785, 790 (7th Cir. 2002). The party seeking to establish an exception to the discharge of a debt bears the burden of proof. *Goldberg Secs., Inc. v. Scarlata (In re Scarlata)*, 979 F.2d 521, 524 (7tyh Cir. 1992); *Banner Oil Co. v. Bryson (In re Bryson)*, 187 B.R. 939, 957 (Bankr. N.D. Ill. 1995).

Furthermore, Exceptions to discharge are to be construed strictly against the creditor seeking the exception and liberally in favor of a debtor. *In re Morris*, 223 F.3d 548, 552 (7th Cir. 2000); *Kolodziej v. Reines (In re Reines)*, 142 F.3d 970, 972-73 (7th Cir. 1998); *In re Zarzynski*, 771 F.2d 304, 306 (7th Cir. 1985).

Plaintiff filed a two count complaint; Count I alleging Embezzlement, 11 U.S.C. 523(a)(4); and Count II alleging Willful and Malicious Injury, 11 U.S.C. 523 (a)(6). Plaintiff's Complaint failed to allege larceny. However, Plaintiff argues for a judgment based on larceny in its memorandum although never pleaded in its Complaint.

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 1334. This matter involves a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) as to determination as to dischargeability of particular debts.

Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1409(a) as a proceeding arising under title 11, U.S.C.

This adversary proceeding was filed prior to the expiration of time for filing of complaints objecting to discharge provided under Rule 4004 of the Federal Rules of Bankruptcy Procedure.

The preponderance of the evidence standard of proof applies to all exceptions from dischargeability of debts contained in 11 U.S.C. § 523(a), including nondischargeability for fraud provisions of 11 U.S.C. § 523(a). *Grogan v. Garner*, 498 U.S. 279, 286-287 (1991).

It must be conceded at the outset that evidence did not show any of the following:

1.    That Debtor sold or made any commercial use of the data, or allowed any other business or person to use or copy it.

2.    That Debtor did harm or destroy the Plaintiff's data in any way so as to prevent Plaintiff's further use of it.

Nonetheless, the issue to be decided is whether Debtor's continued possession of the data in light of threats received by Plaintiffs, and Debtor's lawyer agreement to show the tapes only if a severance package was agreed to, amounted to an injury of Plaintiff that resulted in nondischargeable damages consisting of consequential expenses incurred by employing of experts to find out what secret data Defendant took with him after leaving the business.

### The Preclusive Effect of the State Court Contempt Orders

A state court judgment is entitled to the same preclusive effect in federal court as that judgment would have in state court. *Allen v. McCurry*, 449 U.S. 90, 96 (1980); *see* 28 U.S.C. § 1738.

This rule applies with equal force in bankruptcy cases. *First Weber Group, Inc. v. Horsfall*, 738 F.3d 767, 772 (7th Cir. 2013). Even in the dischargeability context, "[w]here a

state court determines factual questions using the same standards as the bankruptcy court would

use, collateral estoppel should be applied…" *Id.*

Under Illinois state law, collateral estoppel applies when:

(1) the issue decided in the prior adjudication is identical with the one
presented in the suit in question;

(2) there was a final judgment on the merits in the prior adjudication; and

(3) the party against whom estoppel is asserted was a party or in privity
with a party to the prior adjudication.

*In re Owens*, 125 Ill. 2d 390, 399-400 (1988)

Under Illinois state law, a judgment for contempt is a final judgment. "The imposition of

a sanction for contempt is final and appealable because, although occurring with the context of

another proceeding and thus having the appearance of being interlocutory, it is an original

special proceeding, collateral to and independent of, the case in which the contempt arises."

*People ex rel. Scott v. Silverstein*, 87 Ill. 2d 167, 172 (1981).

"While collateral estoppel applies only to issues that have been necessarily and

unambiguously decided, express factual findings are not required because an issue may be

decided from findings implicit in the judgment." *Leventhal v. Schenberg (In re Leventhal)*, 481

B.R. 409, 420 (N.D. Ill. 2012). "In order to determine whether the elements of collateral

estoppel have been satisfied in a dischargeability proceeding, the bankruptcy court should look at

the entire record of the state proceeding, not just the judgment." *In re Tapper*, 123 B.R. 594, 600

(Bankr. N.D. Ill. 1991).

In the State Court Action, by Contempt Order dated February 13, 2014, found that:

Mr. Arvanitis has possession of documents, materials, hardware or
software as set forth in the TRO which he has failed to turn over as

ordered.  Therefore, Mr. Arvanitis is in indirect civil contempt of
court.

(Exhibit 37)

The items "set forth in the TRO" were "any and all documents and materials of any

nature pertaining to any work performed for or related to FNA Group, Inc., . . ." and "any

computer hardware and software containing any of the information contained in Paragraph 1 . . ."

(Exhibit 36 at 2)

The issues determined by the State Court in the Initial Contempt Order, restated by the

second Contempt Order dated June 19, 2014 (the "Second Contempt Order"), were that:  (a) as

of the date of the Second Contempt Order, Defendant had possession of proprietary and

confidential FNA documents and materials; and (b) Defendant failed to return the items as

ordered by the state court.  These issues have already been determined by the State Court and

this Court concludes that Defendant is precluded from relitigating such issues in this Adversary

proceeding, although the same facts are also found from evidence at trial in this Court by

preponderance of evidence.

However, the state court Contempt Order did not contain findings relating to how

Defendant came to possess FNA's confidential documents and materials and whether Defendant

did so with the requisite fraudulent intend and deceit necessary to establish embezzlement or

larceny under § 523(a)(4), or whether Defendant's actions were willful and malicious under

§ 523(a)(6).

### § 523(a)(4) Embezzlement & Larceny (Count 1)

Count I of the adversary proceeding complaint filed by FNA seeks a declaration that

FNA's claim against Defendant is not dischargeable on grounds of embezzlement and larceny

pursuant to 11 U.S.C. § 523(a)(4).

Embezzlement under §523(a)(4) is defined as the "fraudulent appropriation of property
by a person to whom such property was entrusted or into whose hands it has lawfully come."
*Matter of Weber*, 892 F.2d 534, 538 (7th Cir. 1989)

To prove embezzlement, the creditor must show that: (1) the debtor appropriated funds or
property for his or her own benefit; and (2) the debtor did so with fraudulent intent or deceit. *Id.*
For purposes of embezzlement, fraudulent intent "is knowledge that the use is devoid of
authorization." *In re Sherman*, 603 F.3d 11 (1st Cir. 2010) (Souter, J.)  Intent may properly be
inferred from the totality of the circumstances and the conduct of the person accused. *Kaye v.
Rose (Matter of Rose)*, 934 F.2d 901, 903 (7th Cir. 1991), *quoting In re Nahabedian,* 87 B.R.
214, 216 (S.D. Fla. 1988).

A.    **Embezzlement under § 523(a)(4).**

   1.    **Debtor Appropriated FNA's Confidential Property**

Defendant admits that, while he was an FNA employee, he used the FNA VPN System to
transfer trade secrets and confidential FNA materials to his personal email account and he also
used a flash drive to copy such materials so he could work outside the office.

For example, Defendant admits that:

   a.    on April 15, 2012, he transferred to his personal email account a list of
FNA spare parts, specific part numbers and inventory quantities of those
FNA spare parts.  (Trial Transcript at 206-208)

   b.    on May 11, 2012, he transferred to his personal email account information
regarding FNA's shipping process and written procedures regarding that
shipping process to FNA customers (Trial Transcript at 213)

   c.    on May 14, 2012, he transferred to his personal email account a third-party
appraisal report providing a value analysis of returned electronic pressure
washers in inventory at FNA (Trial Transcript at 210)

   d.    on June 15, 2012, he transferred to his personal email account shipping
and pricing information and documents regarding FNA's forwarders for

34

China, all of FNA's contacts throughout the FNA system, and procedures depicting how FNA does business with respect to freight orders (Trial Transcript at 213-14)

e.   on June 22, 2012, he transferred to his personal email account documents and information regarding FNA's pricing system under consideration and the actual final pricing from logistics companies shipping FNA products (Trial Transcript at 216)

f.   on August 5, 2012, he transferred to his personal email account spreadsheets detailing FNA's import costs, pricing and the logistics companies with which FNA does business (Trial Transcript at 215)

These documents constitute trade secrets and confidential information within the meaning of the Trade Secret Agreement. (Exhibit 20)

Defendant understood that he was required by his said Agreement to return all copies of such materials and information to FNA but admitted that he made no effort to return such materials to FNA following the termination of his relationship with FNA on August 29, 2102. (Trial Transcript at 307)

Defendant transferred the above-described FNA trade secrets and confidential information to his personal email account while he was an employee of FNA and then had authorized access to such documents and materials.

## 2.   Debtor Appropriated FNA's Property for His Own Benefit

Defendant retained counsel to negotiate with FNA for a severance package in exchange for which Defendant offered, among other things, to allow FNA's experts to inspect his personal computer, return confidential security access codes and return other confidential information belonging to FNA. (Trial Transcript at 256-57, 259; Exhibit 42 at 35-38; Exhibits 27, 28, 30)

On March 11, 2013, Mr. Alexander received the Threatening Email warning that confidential FNA documents, such as shipping documents, invoices and e-mails would be sent to clients and others unless FNA did "what is right." (Exhibit 29)

The next day, Defendant's counsel admitted to FNA's counsel that "I'm advised that the quoted [anonymous] email was in response to Gus [Alexander's] text to my client . . . " (Exhibit 29)

Defendant has admitted that, at that time, his counsel was authorized to represent Defendant in settlement with FNA, and the state court found that Defendant's counsel admitted that Defendant was the source of the Threatening Email.  (Trial Transcript at 256-57, 259; Exhibit 42 at 35-38; Exhibit 42 at 58)

Likewise this Court finds that Defendant was the source of the Threatening Email.

Defendant improperly continued to withhold FNA's trade secret and confidential documents and information and used such possessions in conjunction with his threats in an attempt to extort FNA while he was negotiating a severance package with FNA, thereby using FNA property as a lever in an effort to obtain a severance package for his benefit.

### 3.    Debtor Lacked Authorization to Appropriate, Return, Make any use of FNA's Confidential Information

In connection with his employment at FNA, Defendant executed a Trade Secret/Non-Disclosure Agreement which defined "Trade Secret" to mean:

> [A]ll documentation, software, knowhow and information relating to the past, present, or future business of [FNA], or any plans therefore, or relating to the past, present, or future business . . . "

(Exhibit 20 at 1)

The Trade Secret Agreement required Defendant to acknowledge that the trade secrets were the sole and exclusive property of FNA and that Defendant was required to "surrender possession of all such trade secrets" to FNA upon termination of his relationship with FNA. (Exhibit 20 at 2)

The Trade Secret Agreement also defined "confidential information" to include:

> Any and all technical and non-technical, business, product and manufacturing operations information about [FNA].

(Exhibit 20 at 3)

The Trade Secret Agreement required that upon termination of his relationship with FNA, Defendant was to return all physical "evidence" of confidential information," which included "copies, records, documents, models or other expressions of the confidential information." (Exhibit 20 at 4)

Defendant does not dispute that he was bound by the Trade Secret Agreement and admits that the signature on that document looks like his signature. (Trial Transcript at 306)

Defendant had a duty to return all trade secrets and confidential information to FNA at or soon after the time he resigned as an employee of FNA.

Debtor was aware that FNA requested him to honor his duty under the Trade Secrets Agreement to return all confidential materials; within days after Defendant's resignation, FNA's president, Gus Alexander, sent an email to Defendant which, among other things, requested return of all FNA property, files and records. Mr. Alexander also requested that Defendant deliver his personal Laptop and other devices to FNA so that confidential data and software could be removed:

> Please return all FNA property in your possession immediately. This will include not only any company-issued or company-paid-for equipment, but also all files and records of FNA – whether in hard copy or electronic form – and all company software and other electronic data. Without limiting the generality of the foregoing, please bring your laptop computer, flash drives, and other storage devices, and any other electronic media that might contain FNA data or software to FNA so we can have a third party remove FNA's proprietary data and software and return the devices to you.

> This material is being requested pursuant to Paragraph 6 of the
> Confidentiality Agreement between you and FNA and otherwise.

September 5, 2012 email from Mr. Alexander to Defendant, Exhibit 23)

Defendant did not respond to this request and, on September 19, 2012, Mr. Alexander

sent another email reminding Defendant of his duty to return all confidential materials and

documents to FNA and again requesting inspection of Defendant's personal Laptop.

> The agreement you do have [with FNA] and which you have
> breached is your Confidentiality Agreement, and I still want you to
> bring in your laptop for a computer forensics expert to check for
> company data and software.

(Exhibit 26)

FNA requested an inspection of Defendant's Laptop and other devices because

Defendant frequently used the FNA VPN System which allowed him to access, from a remote

location, his FNA Desktop and Hard Drive.  (Trial Transcript 203; Exhibit 43 at 103)

As Director of Operations and Logistics and as head of Security, Defendant had access to

of FNA's confidential information and documents regarding its shipping, logistics and world-

wide freight forwarders.  (Trial Transcript at 201, 331)

Defendant had access to confidential pricing information, shipping analysis and

spreadsheets regarding the import of spare parts.  (Trial Transcript at 202, 214-216)

FNA believed that any information regarding technology, manufacturing process and cost

was extremely confidential because it represents FNA's advantage over its competition.  (Trial

Transcript at 332-333)

FNA notified Defendant that it believed confidential documents were on Defendant's

personal Laptop, yet Defendant refused to turn over the Laptop for inspection.  (Trial Transcript

at 311).

FNA requested return of its trade secret and confidential documents and information and requested inspection of Defendant's personal Laptop.

Defendant willfully breached his duty to FNA and retained such confidential information and trade secrets for his own purposes and for his own benefit.

Defendant retained FNA's confidential documents after resigning from FNA and did so with the knowledge that retaining FNA documents was "devoid of authorization." *In re Sherman*, 603 F.3d 11 (1st Cir. 2010) (Souter, J.)

Defendant offered to allow inspection of his Laptop, which FNA believed contained confidential FNA documents, *only if* he obtained a satisfactory severance agreement with FNA.

Defendant's retention of FNA's documents was unauthorized and was done for his own benefit and purpose, that is, to provide Defendant with leverage in connection with the severance package negotiations with FNA.

Defendant threatened to release FNA's trade secret and confidential documents and information unless FNA agreed to a severance package acceptable to Defendant.

Accordingly, FNA has established by a preponderance of the evidence that it is entitled to relief under § 523(a)(4) based on the Defendant's embezzlement of FNA's confidential documents and materials. The relief it is entitled to consists of expenses that FNA must pay to Navigant Consulting and such other consequent damages that FNA is able to prove to the State Court in subsequent proceedings, all of which will be non-dischargeable.

**B.    Larceny Under § 523(a)(4)**

"Larceny is proven for § 523(a)(4) purposes if the debtor has wrongfully and with fraudulent intent taken property from its owner." *Matter of Rose*, 934 F.2d 901, 903 (7th Cir. 1991).

"Embezzlement differs from larceny only in that the original taking was lawful."

*Schaffer v. Dempster (In re Dempster),* 182 B.R. 790, 802 (Bankr. N.D. Ill. 1995)

### 1.    Testimony of Nicholas Barone as to Defendant's Wrongful Taking

As provided by the testimony of its computer forensic expert, Mr. Nicholas Barone, FNA has established by a preponderance of the evidence that Defendant unlawfully transferred 4,600 FNA confidential and trade secret files at 1:51 a.m. on August 29, 2012. (Exhibit 17)  The transfer was made approximately seven hours before Defendant formally resigned from FNA. (Exhibit 1)

The 4,600 files contained a variety of FNA trade secret and confidential information and documents including FNA financial spreadsheets, photographs of FNA operations, invoicing documents and AutoCAD files which are engineering drawings of products that FNA manufactures or contracts out to sub-manufacturers under confidentiality agreements.  (Exhibit 39 at 69-72, 75;  Exhibit 17)

Mr. Barone's expert opinion was that Defendant copied the 4,600 files shown on Exhibit 17 as having been accessed on August 29, 2012.  (Exhibit 40 at 29).

Defendant offered no expert to contradict the expert opinion offered by Mr. Barone at the State Court Contempt Hearing.  (Trial Transcript at 278)  Rather, Defendant suggests that the 4,600 files, copied from Defendant's Western Digital Hard Drive at 1:51 a.m. were being backed up to FNA's server at odd hours in the middle of the night. (Trial Transcript at 154)

For reasons stated below, the testimony of Mr. Barone is found to be more credible than the explanation offered by Defendant that the 4,600 files were simply being backed up by FNA's server.

To begin with, Mr. Barone testified that he examined the Western Digital Hard Drive and he did not find a program on the Hard Drive associated with backing up of files. (Exhibit 40 at 52)

Mr. Barone also explained that, because the VPN System provided remote access to Desktop and Hard Drive, Defendant did not need to be physically present to transfer the 4,600 files on his Hard Drive. (Exhibit 40 at 61).

Additionally, Mr. Barone found evidence that, at that particular time, that is, 1:51 a.m. on August 29, 2012, Defendant's user I.D. was used to log onto the FNA VPN System. (Exhibit 40 at 61-60; Trial Transcript at 151) Logging onto the FNA VPN System is synonymous with logging on to Defendant's Desktop. (Exhibit 40 at 63)

Defendant is a layman with only limited technical knowledge of computer systems. (Trial Transcript at 199)

Defendant's testimony on the issue of possible backup was equivocal and he testified that the transfer of 4,600 files on August 29, 2012 "could be" a backup. (Trial Transcript at 197) Defendant continued, "I couldn't say for sure, but I testified that I believe it could be." (*Id*)

Defendant also testified that the backup of his Desktop was scheduled by the FNA IT Manager. (Trial Transcript at 158, 284) Defendant has no personal knowledge that the IT Manager scheduled the transfer of 4,600 files at 1:51 a.m. on August 29, 2012 (Trial Transcript at 158)

In response to a question from this Court, Defendant testified that, "When I use the word 'backup,' it means it's storing the most recent information." (Trial Testimony at 154)

Yet, the overwhelming majority of files transferred at 1:51 a.m. on August 29, 2012 were old files, created many months and years prior to August 29, 2012.  (See "File Created Date" column 4 of Exhibit 17)

The list, created by Mr. Barone, shows that hundreds of the 4,600 files transferred on August 29, 2012 at 1:51 a.m. were MP3 music files that were created on October 28, 2008 rather than recently created files. (Exhibit 17, column 1, ref. no. 1741 through 1252)

Defendant did not explain or demonstrate why an FNA backup system, which he testified copied only recent information, would copy hundreds of MP3 music and other FNA files created months and years before August 29, 2012.

On questioning by his own counsel, Defendant admitted that he had no personal knowledge as to when his Desktop was backed up:

> Q.    When your desktop computer was being backed up, was
> there any indication of that on your desktop that you were
> able to be made aware that it was being backed up?
>
> A.    No, because I was never around in those hours.

Defendant offered no evidence, other than his denial, to contradict Mr. Barone's testimony that Defendant's I.D. was used to log onto the FNA VPN System at 1:51 a.m. on August 29, 2012.  (Trial Testimony at 293-94)

### 2.    Mr. Saperstein's Testimony As to the Source of Audio Files Found on a CD-ROM Delivered to FNA

FNA's other expert computer forensic witness, Mr. Saperstein, testified that confidential FNA Audio Files came from a non-FNA computer designated Demetrios-PC. (Exhibit 41 at 105, 106, 118)

The Audio Files of confidential FNA conversations were contained on a CD-ROM which was delivered in a sealed box in November or December, 2012, together with a threatening unsigned letter admitted as Exhibit 3. (Exhibit 39 at 18-19)

Defendant offered no evidence to contradict the testimony of Mr. Saperstein. (Trial Transcript at 253)

Based on the evidence introduced at trial and the evidence offered at the State Court Contempt Hearing, the Court finds that Defendant logged onto the FNA VPN System at 1:51 a.m. on August 29, 2012 and transferred 4,600 FNA files to a location known to Defendant.

A great number of those 4,600 files, transferred by Defendant on August 29, 2012, contained trade secret and confidential information which Defendant was not authorized to possess given that he would resign seven hours later.

Based on Mr. Saperstein's expert testimony, the Court finds that Defendant obtained and then possessed the Audio Files which he was not authorized to remove from the FNA facility.

This Court further finds that Defendant's retention of FNA's documents was unauthorized and was done for his own benefit and purpose, that is, to provide Defendant with leverage in connection with the severance package negotiations with FNA.

This Court further finds that Defendant threatened to release FNA's trade secret and confidential documents and information unless FNA agreed to a severance package acceptable to Defendant. (Exhibit 3; Exhibit 29)

The evidence of fraudulent intent, offered by FNA at the State Court Contempt Hearings, and reintroduced into evidence before this Court is sufficient to establish embezzlement and is also sufficient to establish the fraudulent intent element required to establish larceny under § 523(a)(4).

Accordingly, FNA has established, by a preponderance of the evidence, that it is entitled

to relief under § 523(a)(4) based on the Defendant's transfer to his control and then retention of

FNA's confidential documents and materials.  The amounts which FNA will pay to Navigant

Consulting and such other consequent damages that FNA is able to prove to the State Court and

which it may be awarded as a judgment in subsequent proceedings is non-dischargeable.

## § 523(a)(6) Willful and Malicious Injury (Count II)

In Count II, FNA seeks nondischargeability for (i) injury to a party or its property caused

by the Defendant; (ii) willfully; and (iii) maliciously.  *First Weber Group, Inc. v. Horsfall*, 738

F.3d 767, 774 (7th Cir. 2013).

An "injury" is a violation of another's legal right, for which the law provides a remedy.

*Id.*  Willfulness requires "a deliberate or intentional *injury*, not merely a deliberate intentional *act*

that leads to injury." *Id.* (quoting *Kawaauhua v. Geiger*, 523 U.S. 57, 61 (1998)) (*emphasis in*

*original*).  Maliciousness requires proof of conscious disregard of a duty without just cause or

excuse. *Id.*

Based on the evidence submitted at the State Court Contempt Hearings, and reintroduced

here, it is found that Defendant injured FNA by causing the transfer of thousands of proprietary

and confidential FNA files to Defendant's personal computer and Defendant's refusal to return

such to FNA upon demand.

The transfer of these files by Defendant and Defendant's continued possession was

willful and it forced FNA to retain forensic computer experts to examine all of the files on

Defendant's Desktop and on the external hard drive connected to Defendant's Desktop at FNA.

FNA has been invoiced over $200,000 by its forensic experts in connection with its attempt to

recover its confidential information from Defendant.

Further, Plaintiff was required to retain counsel not only to negotiate with Defendant but also to seek recovery of the thousands of transferred files through state court litigation against Defendant during which the Contempt Orders were entered.

As discussed above, by a preponderance of the evidence, FNA established that, without authorization or excuse, Defendant transferred the Audio Tapes and, on August 29, 2012, the 4,600 files many of which contained confidential and trade secret materials belonging to FNA.

Defendant knew that he had a duty to return such information to FNA when he resigned on August 29, 2012, and yet Defendant retained such confidential and trade secret material.

Defendant was the author of the Threatening Email, sent to FNA's President, Mr. Alexander, on March 11, 2013 and Defendant threatened to release FNA files unless an acceptable severance payment was paid.

The Defendant failed to provide FNA with access to his personal laptop, and Defendant failed to return any of the thousands of proprietary and confidential files which FNA established that he transferred to his personal computer.

Based upon the evidence presented by FNA at trial and at the state court Contempt Hearing, the Court finds that the Debtor thereby inflicted an injury upon the Plaintiff knowing he had no legal justification to do so, and either desiring to inflict financial injury through expenses required for a technical investigation, knowing it was highly likely to result from his willful actions. The injury consisted of depriving Plaintiff of its right to sole possession and control of its secret data which created a threat to its commercial interests.

As discussed above, by a preponderance of the evidence, FNA established that Defendant committed intentional and wrongful acts which caused deliberate injuries to FNA by imposing

45

expenses resulting from need to ascertain the nature of withheld data and recover Plaintiffs data

without any just cause or excuse.

Accordingly, this Court concludes that the Defendant caused a willful and malicious

injury and that FNA's claims are nondischargeable under § 523(a)(6).

## CONCLUSION

Separate judgment orders will issue in favor of Plaintiff in accord with these Findings and

Conclusions, each finding nondischargeable damages caused by Defendant's conduct described

herein that may be adjudged in state court proceeding.

ENTER:

Jack B. Schmetterer
United States Bankruptcy Judge

Dated this ___ day of _____, 2015.

SEP - 1 2015